**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Charles David WATSON, Defendant-Appellant.**

No. 72-1964
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Nov. 22, 1972.

Charles R. Desiderio, Atlanta, Ga. (Court appointed), for defendant-appellant.

John W. Stokes, U. S. Atty., Anthony M. Arnold, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

Appellant Watson was convicted under 18 U.S.C. § 659 for knowing possession of merchandise stolen while in interstate commerce and sentenced to eight years under 18 U.S.C. § 4208(a). In this appeal Watson challenges the use at his trial of statements given by him to

---

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Company of

New York et al., 5 Cir. 1970, 431 F.2d 409, Part I.

agents of the Federal Bureau of Investigation during a custodial interview at Atlanta Police headquarters.

Appellant asserts, first, that the district court failed to apply the proper standard for "burden of proof" to the question of Watson's "knowing, intelligent, and voluntary" waiver of his constitutional rights. Secondly, he asserts that even if the proper standard on burden of proof was indeed applied by the trial court, the government failed to meet that standard.

## I.

■ Appellant's first contention seems to be a valiant attempt to avoid the application of Lego v. Twomey, 1972, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618, to his case. In Lego a four-Justice majority of a seven-Justice court held that in order to establish the admissibility of a confession, the prosecution was constitutionally required to show voluntariness by only a preponderance of the evidence. In seeking to avoid the application of Lego, the appellant constructs an argument that while Lego established a lower burden of proof on the issue of the "voluntariness" of a confession, a heavier burden still rests on the government to show "knowing, intelligent, and voluntary waiver". Thus, appellant maintains that there are two separate tests—one on "voluntariness", the other on "waiver"—which must be separately applied before allowing custodial confessions into evidence, and that separate standards for "burden of proof" apply to each of these tests.

In pursuing this line, appellant first argues that the trial court was bound to rule directly and separately on each of these two alleged elements and that in

this case the district court never ruled directly on the issue of waiver. A reading of the order denying suppression shows that both elements were before the district court and that both were clearly included in the denial.[1]

Next, appellant presses his primary argument, asserting that there are two separate tests with separate burdens of proof. Resolution of this point requires a close reading of the Lego case and a clear understanding of just what a trial court is ruling on when it allows or rejects a proffered confession. This court feels that there is only one basic issue which the trial court must decide and that that is admissibility. This ultimate determination involves the determination of several subsidiary issues including the possible application of the various exclusionary rules (such as the one requiring waiver) and whether the incriminating statements themselves were coerced. The notion of "voluntariness" runs all through these determinations. We feel that the proper analysis is that no statement can indeed be "voluntary" unless there is a finding of knowing and intelligent waiver. As the Supreme Court indicated in Miranda v. Arizona, 1966, 384 U.S. 436, 457–458, 86 S.Ct. 1602, 16 L.Ed.2d 694 in order for a statement to be the "product of free choice" (voluntary), the "appropriate safeguards" (warnings and knowing waiver) must be taken at the outset.[2] The determination of all these issues therefore underlies a finding of "voluntariness" which, in turn, is the key to "admissibility".

We now turn to Lego v. Twomey, supra, and an analysis of just to what issue it applies a preponderance test. One of the contentions put forth in Lego was

---

1. The district court entered its denial in a holographic paragraph directly at the end of appellant's motion, right below the section in which appellant claimed no proper waiver. Thus, the court directly denied this element in denying suppression.

2. As the Supreme Court noted in *Miranda*:
   In these cases, we might [well] not find

the defendant's statements to have been involuntary *in traditional terms* . . . . (Emphasis supplied).
384 U.S. at 457, 86 S.Ct. 1602, 1618.
Thus, in *Miranda* the Supreme Court was changing the *traditional* concept of voluntariness by adding the warning and waiver requirements.

that evidence offered against a defendant at a criminal trial and challenged on constitutional grounds must be determined admissible beyond a reasonable doubt in order to give adequate protection to those values which exclusionary rules are designed to serve.

\* \* \* \* \* \*

In each instance, and without regard to its probative value, evidence is kept from the trier of guilt or innocence for reasons wholly apart from enhancing the reliability of verdicts. These independent values, it is urged, themselves require a stricter standard of proof in judging admissibility.

404 U.S. at 487, 92 S.Ct. at 626.

The Court then went on to elaborate on what it felt was the proper standard of proof on the admissibility of custodial confessions. In so doing, the Court directly discussed the preponderance standard and the exclusionary rules:

But, from our experience over this period of time no substantial evidence has accumulated that federal rights have suffered from determining admissibility by a preponderance of the evidence. Petitioner offers nothing to suggest that admissibility rulings have been unreliable or otherwise wanting in quality because not based on some higher standard. Without good cause, we are unwilling to expand currently applicable exclusionary rules by erecting additional barriers to placing truthful and probative evidence before state juries and by revising the standards applicable in collateral proceedings. Sound reason for moving further in this direction has not been offered here nor do we discern any at the present time. This is particularly true since the exclusionary rules are very much aimed at deterring lawless conduct by police and prosecution and it is very doubtful that escalating the prosecution's burden of proof in Fourth and Fifth Amendment suppression hearings would be sufficiently productive in this respect to outweigh the public interest in placing probative evidence before juries for the purpose of arriving at truthful decisions about guilt or innocence.

404 U.S. at 488, 92 S.Ct. at 626.

We feel that this language shows that the Supreme Court felt that the proper standard by which to judge "admissibility", with all its constituent parts, is preponderance of the evidence. The Court seems to have expressly weighed the significance and value of the various exclusionary rules and to have held that requiring proof beyond a reasonable doubt on these issues did not outweigh the value in getting the evidence before the jury.

■ Thus, we reject the alleged inapplicability of *Lego* to this case. In order to avoid application of the various exclusionary rules to custodial confessions, all the government must do is show that the rule was satisfied by presenting a preponderance of the evidence. It seems rather incongruous to this court that the Supreme Court intended that the issue of whether or not certain statements were the product of governmental coercion need only be shown by a preponderance of the evidence and at the same time had the intention of requiring that evidence of waiver of constitutional rights be presented "beyond a reasonable doubt".

■ There seems to be one other possible argument for requiring a standard greater than "preponderance" in this case. This case, unlike *Lego*, is a direct appeal from a federal district court, not the review of a state court as in some *habeas* proceeding. In *Lego* the Supreme Court spoke of the power of the states to adopt a higher standard than preponderance if they so desired. It might then be argued that there is an existing federal standard, applicable only in prosecutions by the United States, which was greater than "preponderance". Such a position has apparently been taken in some other circuits by denominating a "reasonable doubt" requirement as within the "supervisory

power" over the lower federal courts. Ralph v. Warden, 4 Cir.1970, 438 F.2d 786, 793; Pea v. United States, 130 U.S. App.D.C. 66, 397 F.2d 627, 1968. This course, however, seems clearly foreclosed by the opinion of the Supreme Court in *Lego*:

> It is no more persuasive to impose the stricter standard of proof as an exercise of supervisory power rather than as a constitutional rule.

404 U.S. at 488, n. 16, 92 S.Ct. at 626. Therefore, it seems that at this time the proper standard for a federal district court to apply in determining the admissibility of a confession is the preponderance standard.

## II.

Thus, the only question left for determination is whether the government has sustained its burden of showing that the custodial statements were in all respects the product of a free and informed choice.

█ In passing on whether the government has shown admissibility by a preponderance, we must, of course, accept the factual determinations and credibility choices made by the trial judge unless they are clearly erroneous. We wish to point out, however, that this is not the same standard which applies to the issue of admissibility by a preponderance of the evidence. That is a legal conclusion to be drawn from the accepted facts.

█ In viewing the evidence, this court must look to the totality of circumstances to determine if the government has indeed proven the elements of admissibility by a preponderance. Therefore, it becomes necessary to set forth in some detail the factual setting which gives rise to appellant's claim.

Appellant Watson was arrested on January 22, 1972, at about 7:00 A.M. by officers of the Atlanta Police Department on a charge of public drunkenness. In unchallenged testimony it was shown that over a period of from twelve to twenty hours immediately prior to his arrest Watson had consumed a substantial amount of alcohol and had taken a number of "twisters" (a type of pep pill). He had also had little if any sleep during the period.

Watson was and is a diabetic, requiring periodic insulin injections. Soon after his arrest, Watson, who had not recently had an insulin shot, told the Atlanta officers that he was going into hyperglycemic shock and requested that he be taken to a hospital for an insulin treatment. Sometime between 10:00 and 11:00 A.M. Watson received an insulin shot at an Atlanta hospital and was then returned to the Atlanta City Jail.

At about 2:00 that afternoon, FBI agents Hicks and Whitlock arrived at the jail and began to interrogate Watson. Before any direct questioning had begun and at about the time the agents were advising Watson of his constitutional rights Watson indicated to the agents, who knew of his trip to the hospital that morning, that he was going into hypoglycemic shock (commonly known as insulin shock) which results from an oversupply of insulin and corresponding lowered level of blood sugar in the blood stream. Watson requested a soft drink to aid in offsetting the insulin imbalance. The agents obtained a soft drink for Watson. Very soon after giving Watson the drink, the agents advised Watson of his rights and obtained a signed waiver. The agents then questioned Watson and in a fairly short time obtained the incriminating statements later used against him.

The primary claim of appellant is that he did not and could not have waived his constitutional rights knowingly, intelligently, and voluntarily in this case. At trial, appellant testified that he did not remember the warning or the other events connected with the interrogation.[3] The FBI agents testified that Watson appeared to them to be lucid and to

---

3. The trial judge apparently chose not to believe this highly self-serving testimony by appellant in light of the contradictory testimony of the FBI agents.

know what he was doing.[4] Agent Whitlock did testify that the appellant was quite "nervous" before he drank the soft drink but that he "calmed down" afterwards. After hearing all the testimony, the trial judge, obviously with some hesitation, allowed the incriminating statements to come in.[5]

4. We accept the finding of credibility as to the statements by the agents about Watson's appearance and actions at the time of the interview. We shall set forth in some detail the testimony of the agents. Testimony of Agent Hicks (in pertinent part):

Q. Were you able to smell anything on his breath?

A. No, sir.

Q. You could smell no—nothing that smelled like alcohol?

A. No, sir.

Q. How was his speech?

A. He was a lot more clearly spoken than he was up here, nothing erratic at all, just a few jokes now and then, but that was it. He just seemed perfectly normal to me.

Q. Were his eyes clear?

A. Fairly clear, yes, sir. There was no glassiness about them at all. They were a little red.

Testimony of Agent Whitlock (in pertinent part):

Q. Now not going so much into the substance of the interview, did you have an opportunity to observe the defendant, Mr. Watson, during the course of the interview?

A. Yes, sir.

Q. Tell the Court about his appearance and how he conducted himself and how he responded to the questions that were asked to him?

A. He was coherent and knew what was going on. He knew what he was talking about, what we were asking him. I'd say that he was capable· of answering questions.

Q. Were you aware at the time that you interviewed him that Mr. Watson had been arrested for public drunkenness and did you know that he had a problem with diabetics?

A. Yes, sir.

Q. Diabetes?

A. They told us that out at the jail.

Q. Could you observe the effects of any alcohol or medication or any other disabilitating effect?

A. When we were taking him upstairs, he claimed that he had had his insulin shot and that he was a little over, too much, insulin, wanted to know if he could have a coke to counteract it. We got him a coke.

Q. Was this at the outset of the interview?

A. This was the beginning of it, yes, sir.

Q. Did Mr. Watson have any physical problem with his motor sense and getting around, his coordination, moving about?

A. I couldn't say he did, no.

Q. Well, did he appear to be perfectly normal in that respect?

A. Other than his—he was a little nervous until we got him the coke and he said this was because of the insulin. After we got him the coke, he calmed down.

Q. Did he slur his words or have any trouble with his talking?

A. I didn't notice it.

Q. Was there anything unusual about his eyes blinking, drooping or glazed look, anything?

A. I didn't observe any, no, sir.

Q. Did he respond in an intelligent or coherent manner to the individual questions? If he were asked, you know, a question did he respond promptly and with an intelligent answer?

A. Yes, we would ask him a question and he would—the first ones he didn't want to admit anything and then after he did admit to them, why, he would give us the answer.

5. During the examination of the agents and while ruling on admissibility the trial judge stated:

THE COURT: Well, now, wait a minute. Wait a minute, Mr. Whitlock. How can you say that? You just got through telling us that he was nervous when the interview first started and that he asked for a Coca-Cola because he said that he had taken too much insulin. How can you say he was not laboring under any disability?

\* \* \* \* \*

THE COURT: This is the very thing that brought about Miranda, really. I don't think I have got any more common sense than you have got, but I think I have got enough common sense not to interview a suspect within five minutes after he has told me that his insulin is out of balance or whatever it is he told you, he needed a Coca Cola. I don't care whether he said, "How do you feel?" I am surprised, All right. Go ahead.

\* \* \* \* \*

THE COURT: All right. I am going to—I am going to allow the testimony. I just want to say that in furtherance of what I said a moment ago about my surprise that they would engage in interrogation after they knew the man had had some insulin imbalance. I have tremen-

This court too has had difficulty in passing on whether, in light of all the uncontroverted evidence which showed that this appellant had to be at least a little disoriented at the time waiver was obtained, the mere statements by two FBI agents that the appellant "appeared" to be basically all right is enough to meet the legal test of voluntariness by a preponderance of the evidence. After due deliberation, we find that it does not satisfy the standard.

There was no evidence that these agents had any expert knowledge with regard to how a person, in light of the exhaustion and other circumstances in this case, would "appear" while suffering from insulin shock. Furthermore, the government has not endeavored to present any testimony on what the capabilities of a normal diabetic under these circumstances would be. This court does not feel that it has the medical ability to evaluate the impact of this alleged shock on one's ability to fully understand and appreciate the reading of his constitutional rights and give a meaningful waiver of those rights.

It seems clear that no one really disputes that immediately prior to the warning and waiver in this case the appellant was indeed under at least some sort of medically connected disorientation. The comments of the trial judge and the agents indicate that appellant was indeed slipping into insulin shock. The only evidence which the government put forward in clarification of this issue was the testimony of two non-experts that they, in essence, did not see anything particularly wrong with appellant. We do not find that sufficient to show that appellant was able to knowingly, intelligently, and voluntarily waive his constitutional rights.

We feel that we must remand this case to the district court for a redetermination by that court on the question of voluntariness of the confession and knowing waiver. It does not seem necessary to order a new trial for appellant in order to settle this issue. The missing ingredient in this case is some sort of medical expert testimony which will serve as a guide to the district court in deciding what indeed was the probable mental condition of appellant at the time he was interviewed. This court lacks the requisite medical acumen to decide that issue alone and we feel that in all probability the district court lacks it; we are also convinced that these FBI agents lack such knowledge. It would seem sufficient as a start to have an adversary hearing to determine, through examination of medical experts, the probable impact of the circumstances presented in this case on one's reasoning. If the district court then felt that the condition of appellant was more serious than previously understood, a new trial could be ordered and the confession suppressed. If these proceedings result in a determination that appellant was able to knowingly waive his rights, there will be a sufficient record to aid this court in its review. We simply hesitate to rule conclusively in a case involving most delicate constitutional rights when we feel that quite helpful information which could perhaps clearly resolve a close issue in one way or another may be readily available.

We would also like to comment on why we think that the burden to produce this evidence rests with the government in this case. First, it should now be well recognized that the government has the initial burden of presenting evidence on voluntariness. Here the government, in presenting that evidence, virtually admits that at a delicate moment in the custodial interview process this appellant was indeed suffering from some

---

dous respect and admiration for the FBI, everybody that I have ever known. You are not to take that as anything personal but I think common sense should have told you that. . . . Common sense should have told you that you should have waited some time and made certain he was all right before you interrogated him. I think based on the testimony that I have heard that the statements made to Agents Whitlock and Hicks were voluntary and I will allow it in. Anything else?

medically connected abnormality. There is no claim that Watson staged or faked the statements about suffering from insulin shock. The totality of circumstances indicate that Watson may possibly have been disoriented when asked to waive his rights. It is uncontroverted that the government's agents had knowledge that this appellant's condition may have been something less than "normal". Yet these agents, not at all shown to be medically expert, decided that this appellant was competent to waive his constitutional rights, and undertook to obtain a waiver of rights and to question without more than cursory delay or further investigation. In light of this fact and the admitted circumstances presented in this case, we feel that the government, in order to show waiver by a preponderance, had the duty to present medical testimony to support the determination of its agents that this man was indeed able to make an acceptable waiver. The mere observation by medically untrained laymen with nothing else is simply not sufficient here.

Remanded.