**UNITED STATES of America**

**v.**

**Darnell H. BLOCKER.**

**Crim. No. 1077–72.**

United States District Court,
District of Columbia,
Criminal Division.

Feb. 7, 1973.

Harold H. Titus, Jr., U. S. Atty. for D. C., Ruth Banks, Asst. U. S. Atty., Washington, D. C., for plaintiff.

Stephen E. Moss, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

FLANNERY, District Judge.

The defendant, who is charged with passing an altered one-dollar bill,[1] moved to suppress the confession he signed while in custody following his arrest. Subsequent to the hearing on the motion, the court requested that counsel submit further information concerning the defendant's education and I.Q. Counsel for the defendant submitted school records, mental ability test results and a description of the special school which the defendant had attended.[2] Upon consideration of the evidence received at the hearing, the memoranda of both counsel and the information concerning the defendant's education and I.Q., the court concludes that the defendant's confession must be

---

1.  *See* 18 U.S.C. § 472 (1970).

2.  Court's Exhibits Nos. 1–1F.

suppressed because (1) the defendant was denied his right to counsel and (2) the defendant did not voluntarily waive the rights guaranteed him by Miranda v. Arizona.[3]

The defendant is a 21-year-old individual of low intelligence.[4] Although he completed the seventh grade,[5] the defendant has always had difficulty reading[6] and attended a school for slow learners during his last year of school.[7] His only prior contact with the law was a charge of assault with a deadly weapon. That charge was filed, and subsequently dropped, by his uncle.

At the suppression hearing, the defendant's responses on the witness stand were lethargic and without feeling. He experienced difficulty in comprehending the questions asked by counsel and the court, and some questions had to be repeated several times. Frequently his responses were interrupted by long pauses when he apparently forgot the question asked.[8]

■ The defendant was arrested at 9:30 p. m. on March 1, 1972, at a Gino's Restaurant where he allegedly passed an altered one-dollar bill. Apparently the "10" from a ten-dollar bill had been taped over the "1" on a one-dollar bill. The arresting officers read the standard *Miranda* warnings[9] to him at the scene of the arrest and again before arriving at the station house.

The defendant testified that upon arriving at the station house he requested a lawyer but was told that the police do not provide lawyers. According to defendant, the police advised him that he could discuss the matter with someone who was coming over from the "federal building." There was no testimony by the police concerning defendant's alleged request for counsel.

■ At 11:30 p. m., two hours after the arrest, two Secret Service agents arrived at the station house to question the defendant. They accompanied him into an interrogation room and administered the *Miranda* warnings. The defendant was provided a copy of these warnings to read as the agents recited

---

3.  384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4.  The defendant's school records reflect an I.Q. of 70, determined by the Otis test, and an I.Q. of 99, determined by the Wechsler test. Court's Exhibit No. 1B. A psychological report on the defendant, prepared in 1965 by the Child Study Division of the District of Columbia Public Schools, states, "[t]esting revealed little indices of organic brain damage, however, there is a great deal of disorientation and a strong inability to organize and integate the totality of his environment. . . . The subject is presently reading on a primary grade level, and intensive remedial reading is warranted." Court's Exhibit No. 1A.

5.  Although defendant testified that he completed the ninth grade, his cumulative school record indicates that he only completed the seventh grade. Transcript at 7, 23; Court's Exhibit No. 1F.

6.  *See* note 4 *supra*; note 12 *infra*.

7.  The defendant attended the "Twilight" Program at Terrell Junior High School from March 1965 to March 1966. The purpose of this program is "to provide a highly specialized education center for boys who are unable to profit from the regular program of instruction because of emotional or behavioral problems." Court's Exhibit No. 1C.

8.  There is no evidence that the defendant uses or had used drugs, and he did not appear to be under the influence of drugs or alcohol at the time of the hearing.

9.  The standard warnings are printed in Pettyjohn v. United States, 136 U.S. App.D.C. 69, 70 n. 3, 419 F.2d 651, 652 n. 3 (1969), cert. denied, 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970).
    The defendant contends that he has the right to be informed not only of the standard *Miranda* rights, but also of his right to be presented before a judicial officer who will inform him of his right to counsel and consider his release on bail. Counsel for the defendant cites no cases for this proposition and the court has not found any cases which even consider the argument. Courts are satisfied if the standard *Miranda* warnings have been given. *See, e. g.,* United States v. Frazier, No. 23,528 at 16, 17 (D.C. Cir., Jan. 26, 1973) (en banc).

the warnings to him,[10] and he signed a form indicating he understood his rights.[11] The agents testified that the defendant appeared to read the statement and that he at no time indicated an inability to read or comprehend the rights statement. At the hearing, however, a question arose as to whether the defendant could read at all.[12]

The defendant's interrogation continued for one and one-half hours. Both agents questioned him, alternating the subject of the questions between routine administrative matters and the transaction leading to his arrest. Shortly after the interrogation began, the defendant was told to remove all his clothing and bend over. A strip search ensued for a period of about three minutes.[13]

During the interrogation the agents advised him that he could be imprisoned for 20 years but that, if he cooperated, the agents could secure his prompt release on low bail.[14] The defendant testi-

10. One agent testified that defendant read a copy of the rights form as the agent read it to him. Transcript at 46, 61. The other agent testified that defendant read the form after it had been read to him. Transcript at 69.

11. A signed waiver form is strong evidence that a suspect voluntarily waived his *Miranda* rights. *See* United States v. White, 451 F.2d 696, 700–701 (5th Cir. 1971), cert. denied, 405 U.S. 998, 92 S.Ct. 1268, 31 L.Ed.2d 468 (1972). But the existence of a signed waiver form is not conclusive on the issue of voluntary waiver. The court must still decide whether, in view of all the circumstances, defendant's subsequent decision to speak was a product of his free will. *E. g.*, Cooper v. Griffin, 455 F.2d 1142, 1145–1146 (5th Cir. 1972).

12. [The Prosecutor]: Mr. Blocker, are you able to read?
[The Defendant]: Not that good, no.
[The Court]: What do you mean, "not that good"? You can read the newspaper, can't you?
[The Defendant]: Your Honor, my reading is poor.
[The Court]: But you read the newspapers from time to time; read the Sports page?
[The Defendant]: No, not that much.
[The Court]: Don't you read the Sports page?
[The Defendant]: No.
[The Court]: Read the funny papers?
[The Defendant]: Look at it on television.
    *       *       *       *       *
[The Court]: I show you Defense Exhibit No. 1 for identification [the confession]. You see that first paragraph there? Where it begins "I have . . ." do you see that?
[The Defendant]: "I have been . . ." I don't know that word. [The word was "advised."]
Transcript at 22–23.

13. The first agent who testified admitted that a strip search occurred in this case. Transcript at 52. The other agent testified that he did not recall whether a strip search had occurred. Transcript at 72, 77–78.

14. [The Defendant]: I put my clothes back on and I guess he got kind—well, he got kind of bored and he started using profanity and this type of thing; really getting on me and so he was telling he how much time I would get if he go downtown and talk to the man, and he could give me 20 years and never get out on bond; give me $100,000 bond and this type of thing.
*Id.* at 14.
[Defense Counsel]: All right did he mention anything else to you?
[The Defendant]: Yes, and he was telling me about, you know, he was making a deal. He really wanted me to say nothing that I didn't want to say, but the way he kept telling me about the time; that I would never get out, this type of thing and I got scared and I asked him the best way out of it. And—
*Id.* at 15.
[Defense Counsel]: You understand those rights, Mr. Blocker; why then did you sign this statement, Mr. Blocker, which is Defense Exhibit No. 1?
[The Defendant]: They scared me.
[The Court]: Because you were scared, is that right?
[The Defendant]: Yes, sir. Officer Daley when he started telling me he could go downtown and talk to the man to give me 20 years and put me on $100,000 and I could never get out. The way he talked to me, he frightened me and I said anything that came to mind.
*Id.* at 21–22.
[The Prosecutor]: What did he say? What promises?

fied that he believed the agents "were making a deal" and that he signed the statement because he was scared.[15]

At first the defendant repeatedly denied passing the altered bill, but the agents repeatedly said they did not believe him.[16] Eventually he admitted passing the bill but maintained he had no knowledge that it was counterfeit. After the agents threatened to check for fingerprints under the tape on the bill, the defendant indicated his willingness to sign a statement. There is conflict-ing testimony concerning exactly how the statement was prepared, but defendant signed it at 1:00 a. m. At 10:00 a. m. on March 2nd, he was presented before a magistrate.[17]

I

Evidence of the defendant's confession must be suppressed if it was obtained in violation of his fifth amendment right to counsel.[18] The court finds from the evidence adduced at the hearing that the defendant requested and

---

[The Defendant] : This was the same thing, if he—like when I told you that he frightened me so much I asked him the best way out of it, and he say, "well, if you come out with the information he want because he was trying to help. When I said I wasn't guilty, that he would have me out the next day and I would be in the streets and this type of thing. This is what he told me.

[The Prosecutor] : Did he say the charge would be dropped and you would not have to come to Court on it?

[The Defendant] : Well, he did say that I wouldn't have to worry about nothing; that I would be out the next day.

*Id.* at 31–32.

Although the agents testified that they only informed defendant of the maximum possible penalty and of their ability to recommend leniency, it is likely that defendant's version accurately depicts the tone of this conversation which occurred during a heated interrogation intended to produce a confession.

15. Note 14 *supra.*

16. [Defense Counsel] : So, the conversation or interrogation or whatever had been going on for one hour before he acknowledged his guilt, is that correct?
[Secret Service Agent] : Yes, sir.
[Defense Counsel] : And during that hour, he repeatedly maintained his innocence, did he not?
[Secret Service Agent] : Yes, sir, he did.
[Defense Counsel] : And each time he maintained his innocence, you told him that you didn't believe him, did you not; either you or Agent Daley?
[Secret Service Agent] : Both.
Transcript at 62.

17. Defendant's contention that the *McNabb-Mallory* rule was violated is without merit. The *McNabb-Mallory* rule requires presentment of an arrested person before a magistrate "without unreasonable delay" and excludes incriminating statements obtained in violation of that obligation. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) ; McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) ; *see* Fed.R.Crim.P. 5(a). In this case defendant was arrested at 9:30 p. m., interrogated between 11:30 p. m. and 1:00 a. m., and presented before a magistrate as soon as one became available at 10:00 a. m. the next morning.

The *McNabb-Mallory* rule does not prohibit all delay—only unreasonable delay. Wise v. United States, 127 U.S.App.D.C. 279, 281, 383 F.2d 206, 208 (1967). The delay in this case was not unreasonable since defendant was presented as soon as the magistrate's office opened. The delay was not caused by any desire to interrogate defendant ; in fact, the major part of the delay occurred after the interrogation was completed.

Furthermore, a confession obtained within six hours of arrest is not to be suppressed if the only ground for suppression is that defendant was not promptly presented before a magistrate. 18 U.S.C. § 3501(c) (1970). In this case, the confession was obtained within three and one-half hours of the arrest.

18. Miranda v. Arizona, 384 U.S. 436, 444–445, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It is unnecessary to decide at this time whether the confession would be admissible for impeachment purposes. *See* Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) ; Alesi v. Craven, 440 F.2d 975, 977 (9th Cir.), cert. denied, 404 U.S. 856, 92 S.Ct. 103, 30 L.Ed.2d 97 (1971).

was denied counsel even before he entered the interrogation room with the two Secret Service agents. The defendant testified that he requested a lawyer before the Secret Service agents arrived at the station house. According to the defendant, the police not only told him that no attorney was available, but also responded that he could consult with someone from the "federal building." This testimony was not contradicted at the hearing. The fact that the defendant related more than a simple request for and denial of counsel suggests that defendant's allegations are credible. Furthermore, the statement the defendant attributes to the police—that no counsel was available but that he could speak with someone from the "federal building"—is not an improbable response by police who have in custody a confused, ill-educated and uncounselled suspect.

■ The court, therefore, finds that the confession occurred after defendant had requested and been denied counsel. Consequently, evidence of the confession must be suppressed.

## II

■ There is a further reason for suppressing the confession in this case. The interrogation tactics of the Secret Service agents, considered with this youthful defendant's apparent mental deficiency, require the conclusion that the defendant did not voluntarily waive the rights secured by Miranda v. Arizona.[19]

Under the Constitution a suspect is guaranteed the rights to remain silent and to the assistance of counsel during in-custody interrogation, and evidence obtained in violation of these rights is inadmissible in a subsequent criminal prosecution.[20] Of course, the suspect may waive his rights, provided the waiver is voluntary, knowing and intelligent.[21] A "heavy burden"[22] rests on the Government to demonstrate the voluntariness of the waiver.[23] Where, as in the present case, agents confront the suspect for the sole purpose of securing a confession, the court must carefully examine the purported waiver.[24] The "totality of the circumstances" must be considered,[25] including any coercive tac-

19. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).

20. *Id.* at 444–445, 479, 86 S.Ct. 1602.

21. *Id.* at 444, 86 S.Ct. 1602.

22. *Id.* at 475, 86 S.Ct. 1602.

23. Since this court finds that the Government failed to establish voluntariness by a preponderance of the evidence, it is unnecessary to decide whether voluntariness must be established beyond a reasonable doubt. *See* Lego v. Twomey, 404 U.S. 477, 479 n. 1, 489, 96 S.Ct. 619, 30 L.Ed.2d 618 (1972) (reasonable doubt standard is not constitutionally required, but states are free to adopt this standard) ; United States v. Watson, 469 F.2d 362, at 364, 365 (5th Cir., 1972) (*Lego* precludes imposition, under supervisory power, of reasonable doubt standard in federal courts) ; United States v. Robinson, 142 U.S.App.D.C. 43, 55, 439 F.2d 553, 565 (1970) (applies reasonable doubt standard) ; Pea v. United States, 130 U.S.App.D.C. 66, 76, 397 F.2d 627, 637 (1968) (en banc) (adopts reasonable doubt standard under supervisory power). A recent decision by the United States Court of Appeals for the District of Columbia refers to the Government's burden without precisely defining that burden. United States v. Frazier, No. 23,528 at 2, 12 (D.C.Cir., Jan. 26, 1973) (en banc) ; *id.* at 18 (Bazelon, C. J., dissenting).

24. Escobedo v. Illinois, 378 U.S. 478, 485, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) ; Spano v. New York, 360 U.S. 315, 323–324 (1959). In determining whether a defendant voluntarily waived his *Miranda* rights, a court may consider factors enumerated in pre-*Miranda* decisions because the underlying issue is the same in pre- and post-*Miranda* cases—whether there was a voluntary decision to speak. Note, The United States Courts of Appeals : 1971–1972 Term, Criminal Law and Procedure, 61 Geo.L.J. 275, 343 (1972) ; *see* United States v. Watson, 469 F.2d 362, at 363 (5th Cir., 1972).

25. Fikes v. Alabama, 352 U.S. 191, 197, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957).

tics used in the interrogation process [26] and the age, intelligence and experience of the defendant.[27]

The interrogation in the present case lasted for one and one-half hours while two agents alternately fired questions at the defendant, a person of restricted mental ability. Early in the interrogation the defendant was forced to strip and stand naked before his interrogators as the questioning proceeded. At the hearing on the motion to suppress, the agents were unable to explain satisfactorily the purpose behind the strip search of this young defendant. The first agent testified that a strip search is conducted on a hostile or possibly dangerous suspect to protect the interrogating agent against hidden weapons. When asked how defendant evidenced hostility, he replied, "[T]he police officers advised us that he had . . . not been cooperative to the security guard . . . and that he wasn't saying anything to them." [28] The second agent testified that defendant was not hostile. He further testified that the type of weapon uncovered in a strip search does not present any danger to the agents in the interrogation room. Rather, according to the second agent, the purpose of a strip search is to insure that a suspect is unarmed before delivering him to other authorities, and consequently a strip search is conducted at the conclusion of an interrogation.[29] Since the strip search in this case occurred at the outset of the interrogation, the only reasonable conclusion is that the agents conducted the strip search to humiliate the defendant into confessing against his will. While in certain circumstances a strip search may be reasonable and indeed necessary, this court cannot countenance such a procedure when its sole purpose is to break down resistance by humiliating and personally degrading an individual in police custody.

In addition to subjecting the defendant to a strip search, the agents made the defendant aware of the maximum penalty for the alleged offense and of the likelihood of his release on low bail if he cooperated. The defendant testified that this information was conveyed in the form of threats, that he thought the agents were "making a deal," and that the agents said "not to worry about nothing" if he confessed.[30] A promise of leniency or threat of additional prosecution is a recognized form of psychological coercion,[31] and a court must carefully scrutinize a purported waiver of constitutional rights by a youthful and mentally deficient defendant.[32] In this case, defendant's age and limited mental ability suggest that the

---

26. A primary purpose of the exclusionary rules is deterrence of lawless police conduct. *E. g.*, Lego v. Twomey, 404 U.S. 477, 489, 96 S.Ct. 619, 30 L.Ed.2d 618 (1972).

27. *See, e. g.*, Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967) (illiterate; third grade education; eight hour interrogation; held, no voluntary waiver); United States v. Howard, 470 F.2d 406 (D.C.Cir. 1972) (23 years old; electronic communications specialist; prior experience with lawyer; held, voluntary waiver); Cooper v. Griffin, 455 F.2d 1142 (5th Cir. 1972) (defendants aged 15 and 16; I.Q.'s between 61 and 67; second grade reading ability; 12 hour interrogation; held, no voluntary waiver); Cotton v. United States, 446 F.2d 107 (8th Cir. 1971) (15 years old; four years total education; two hour interrogation; held, voluntary waiver).

28. Transcript at 57.

29. *Id.* at 77–79.

30. Note 13 *supra.*

31. *E. g.*, United States v. Springer, 460 F.2d 1344, 1346–1347 (7th Cir. 1972); Harris v. Beto, 367 F.2d 567, 568 (5th Cir. 1966); *see* United States v. Glasgow, 451 F.2d 557, 558 (9th Cir. 1971) (per curiam); Dorton v. United States, 447 F.2d 401, 413 (10th Cir. 1971).

32. *See* Sims v. Georgia, 389 U.S. 404, 407, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967); Cooper v. Griffin, 455 F.2d 1142, 1145 (5th Cir. 1972); United States v. Glasgow, 451 F.2d 557, 558 (9th Cir. 1971) (per curiam).

defendant would be particularly susceptible to psychological coercion in the form of threats and promises of leniency.

In view of the "totality of the circumstances," the court has concluded that the Government has not established by a preponderance of the evidence that defendant voluntarily, knowingly and intelligently waived his rights to remain silent and to the assistance of counsel. It is, therefore, this 7th day of February, 1973,

Ordered that defendant's motion to suppress evidence of the confession be, and it hereby is, granted.