The UNITED STATES

v.

John Cornelius CRAMER.

No. 71–CR–986.

United States District Court,
E. D. New York.

Nov. 5, 1973.

Robert A. Morse, U. S. Atty., E. D. N. Y., by James M. Pascarella, Asst. U. S. Atty., for plaintiff.

Stephen R. Mahler, Zuckerberg, Santangelo & Mahler, Forest Hills, N. Y., for defendant.

MEMORANDUM and ORDER

COSTANTINO, District Judge.

This is a criminal prosecution charging defendant John Cornelius Cramer with two counts of theft of men's suits from foreign commerce in violation of 18 U.S. C. § 659 (1971). On September 17, 18, 19, 1973 a hearing was held to determine the disposition of defendant's motion to suppress written and oral statements made by him to the police and the suits

and a wrapper seized by the police at the time of his arrest. Decision was reserved.

The following facts adduced at the hearing are uncontroverted. At approximately 12:00 noon on August 9, 1971 Port Authority police at John F. Kennedy International Airport in New York City received a phone call informing them that two men were unloading articles from a Pan American Airlines truck and placing them in two cars located in an employees parking lot. The cars were described as a green Ford and a white Chevrolet. Detectives Frederick Shinkle and John LoPresto proceeded to the lot and located the two cars. Through the window of the Ford they observed a shopping bag containing several pints of whisky with Pan American markings. Nothing suspicious was observed in the Chevrolet. An automobile registration check was made on both cars and the Ford was found to be registered to Theodore Manos of Nutley, New Jersey. The Chevrolet was registered to Jack DeMichel of Lindenhurst, New York.

Detectives maintained surveillance on both cars. At about 2:45 p. m. someone started to enter the Ford. The detectives approached him and asked that he identify himself. He said he was Theodore Manos, a supervisor at Pan American. When asked how he got the liquor, he said two Pan American employees who worked under him, John Cramer and Jack DeMichel, had put it there after Cramer had asked permission to take a truck over to the lot. Manos told the detectives that Cramer had asked him for his automobile keys and had said that he had something for Manos.

After releasing Manos, Officers Shinkle and LoPresto joined other officers who were watching DeMichel's car. At approximately 3:00 p. m. someone approached that car and the officers asked him to identify himself. It was Jack DeMichel. Detective Shinkle informed him of his Miranda warnings and asked him what he had been doing earlier in the parking lot. DeMichel told the detectives that he had been helping Cramer load suits into Cramer's car. He said that Cramer had taken the suits from an aircraft. The detectives asked DeMichel to open the trunk of his car. He consented, but they found nothing suspicious.

After unsuccessfully trying to locate Cramer's car in the parking lot, the officers ascertained his address from Pan American's records. It was 2717 Anthony Avenue, North Bellmore, New York. Shinkle called Nassau County Police and requested assistance in watching Cramer. Shinkle, LoPresto, and three detectives assigned to airport duty from the Queens County District Attorney's office drove out to Cramer's residence in North Bellmore. They met two Nassau County detectives, Austin and Crowley, who had been watching Cramer's house since arriving a few minutes earlier.

What subsequently occurred is the basis for defendant's motion to suppress. Detectives Shinkle, LoPresto, and Austin all gave essentially the same description of the events of that afternoon. Austin and Crowley stood on the top step outside the side door of the house and rang the bell or knocked on the door. Detective Shinkle stood a few steps below them and the other detectives stood in the driveway. A man came to the door and Austin informed him that they were there investigating a crime. He asked the man to identify himself and defendant said he was John Cramer. The officers testified that Shinkle asked Cramer if he would prefer talking inside. After receiving an affirmative answer they went in. The other detectives followed the first three in and they all entered the kitchen which was just inside the side door.

Detectives Austin, LoPresto and Crowley all testified that Austin sat down at the kitchen table and immediately began reading defendant the Miranda warnings. Shinkle recalled that as he entered the kitchen he saw George Eady, a friend of defendant's, and immediately

took him aside to question him. After completing this questioning, Shinkle returned to the kitchen where Austin and LoPresto were talking with defendant. Shinkle testified that he took out a printed "rights" card and read defendant his rights. Austin recalled that Shinkle only started to read and that he, Austin, had interrupted Shinkle by saying that he had already given defendant his rights.

Detective Austin testified that after defendant had been given his rights he said, "You got me. The suits are in the basement." Shinkle, who was in another room with Eady, could not hear this, but testified that when he returned to the kitchen Austin said to him that Cramer had already admitted taking the suits. Austin sat at the kitchen table and drafted a statement for Cramer to sign. Detectives LoPresto and Crowley testified to substantially the same effect. After Austin composed the statement and read it to Cramer, Cramer signed it. The statement reads as follows:

August 9, 1971

My name is John Cramer. I am 32 years old being born Dover, New Jersey. I reside at 2717 Anthony Avenue, Bellmore, N.Y. Home Phone CA 1–4017.

I have been informed by the Detective that I have the right to remain silent and that any statement I'd make may be used as evidence against me in Court. Also that I have the right to talk to a lawyer before answering any questions and to have an attorney present at any time.

Further, that if I cannot afford to hire a lawyer, one will be furnished me. And I have the right to remain silent until I have had the opportunity of consulting with an attorney. Having been informed of these rights, I wish to make the following statement without consulting an attorney.

I am presently at my house and allowing detective to take 32 suits which I stole and to look around the surrounding area.

/s/ John C. Cramer

The detectives testified that Cramer then led several of them, including at least Detectives Austin, Crowley, Shinkle and LoPresto, into the basement. They walked through a finished area and back to an unfinished area where they found the suits hanging from the ceiling. A vinyl wrapper bearing Pan American markings was on the floor. Thirty-two suits were counted and Shinkle testified that he then formally placed Cramer under arrest. Austin and LoPresto corroborated this.

The above recounted events are totally and completely contradicted by Eady and Cramer. Each man's testimony was completely consistent with the other and both alleged that no Miranda warnings were ever given, that the basement search was completely without consent, and that the statement was drafted and signed after the search—not before. Specifically, Eady said he was sitting at the kitchen table with Cramer when someone knocked on the side door. Cramer answered it and Eady could see a group of men standing outside. They identified themselves and started walking in saying something like, "You have got some friends." Eady testified that one detective said, "Where's the six suits," and that Cramer said "They're downstairs." Eady said that defendant also asked for a search warrant. Eady and Cramer both testified that one officer opened his jacket and had a white piece of paper in his pocket. He pulled it out, quickly flashed it at Cramer and tucked it back in. Eady said the officers searched all over the house without Cramer's permission. He testified that he specifically remembered that several detectives had gone down to the basement before the defendant was taken down. He said that during the questioning of Cramer, he was taken outside by Detective Crowley who asked Eady if he could search his car. Eady consented

but nothing was found. Eady testified that he was then brought to the basement, something which none of the detectives recalled, and observed the suits being counted. When everyone came upstairs to the kitchen again Eady said he was present when Detective Shinkle started to read defendant his rights and Austin interrupted Shinkle saying defendant already knew them. Eady said it was then that the statement was drafted and signed.

Defendant's testimony was substantially the same as Eady's. The agents barged in without waiting for permission, searched all over the house, and gave Eady and himself the "third degree." They succeeded in getting defendant to admit that he had taken the suits. When he told the detectives that the suits were in the basement, he was taken there by Austin, Shinkle and another. He said two other detectives were already in the basement when he got there.

After coming back up Cramer said he was asked if he had any other contraband in the house and he said that he had a revolver his stepfather had given him. He took it out of a dresser drawer in his bedroom. It was only then that defendant said the statement was drafted and signed. The incident with Shinkle starting to administer the warnings and Austin interrupting him took place after the basement search according to defendant. He further testified that never during the entire episode was he formally placed under arrest.

■■ The law on the subject of consent searches is clear. To have a valid warrantless search, the government must prove that consent was "freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Voluntariness is to be determined in each case by an examination of all of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). It is the function of the court to weigh the evidence and determine whether the government has met its admittedly heavy burden of proving voluntariness. United States v. Gaines, 441 F.2d 1122, 1123 (2d Cir. 1971).

Defendant cites one fact to support his position that the detectives were not telling the truth. If the statement had been drafted before the search of the basement, as the detectives testified, how could they know that there were thirty-two suits. He asserts that the statement was taken after the search. This, however, is not necessarily true. It is clear from the statement itself that defendant was supplying information to Austin as the detective prepared it. Defendant related his birth date and place. It is entirely possible that he also knew and told Austin how many suits he had stolen.

The government argues that had the statement been drawn up after the search and before defendant was taken away, as defendant and Eady recall, then surely it would have included permission to search the bedroom dresser drawer and seize the gun. After all, Detective Austin, who drafted the statement, would have been as concerned about the gun charges which were subsequently brought as he was about the suits. No mention is made in the statement about the gun search—a fact consistent with the detective's testimony.

■■ Viewing the demeanor of the witnesses and all the evidence, the court finds that Miranda warnings were administered to defendant before he orally admitted having the stolen suits and before he signed the statement. Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); United States v. Watson, 469 F.2d 362 (2d Cir. 1972). The court also finds that defendant freely and voluntarily consented to the search of the basement both orally and in writing.

Accordingly, the motion to suppress the oral and written statements and the suits and wrapper is denied.

So ordered.