**UNITED STATES of America**

v.

**Tony WILLIS.**

**Crim. No. 75–16.**

United States District Court,
E. D. Pennsylvania.

July 7, 1975.

Wallis Wetlesen, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Joseph V. Furlong, Jr., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

This matter comes before the Court on the defendant's Motion for a New Trial after a jury verdict of guilty on five counts of a five-count indictment. The indictment charged the defendant in each count with the possession of a check which had been stolen from the United States mail.[1]

The defendant, in his Motion for a New Trial, asserts that the Court erred in not suppressing the defendant's written statement made after he was taken into custody. The defendant asserts that he was not aware of his rights under the Fifth Amendment and that, therefore, he did not knowingly and intelligently waive these rights prior to giving a written statement to Postal Inspector Smaeder. His contention is that the required *Miranda* warnings were never meaningfully related to him. The defendant also asserts that the written statement was the result of the dictation of Postal Inspector Smaeder and was not his own account of the events which led to this indictment. Finally, the defendant asserts that his statement was the product of illegal conduct on the part of the "bank detective" who apprehended the defendant attempting to cash the allegedly stolen checks.

Prior to trial, the Court held a suppression hearing to determine these issues. The following facts were established at that hearing. At approximately 12:40 p. m. on December 12, 1974, the office of the Philadelphia Bank De-

---

1. Each count charged the defendant with violating 18 U.S.C. § 1708.

tectives (Bank Detectives) was notified that an individual was attempting to cash a stolen check at the Provident Bank (Provident) located at Broad and Chestnut Streets, Philadelphia, Pennsylvania. Ralph Smith, a bank detective, arrived at Provident at approximately 12:43 p. m. and was told by a representative of the bank that the defendant had given him a check payable to Barney Tratenberg. (N.T. 1–49). Mr. Smith asked the defendant if he was Barney Tratenberg and the defendant replied that he was not and that his name was Willis. (N.T. 1–49, 1–50). Mr. Smith then asked the defendant how he came into possession of the check and the defendant replied that he had gotten the check out of the mail. (N.T. 1–50). The defendant was then asked to accompany Mr. Smith across the street to the Bank Detectives' office. When Mr. Smith returned to his office with the defendant, he asked someone in the office to call the Postal Inspectors.

Postal Inspector Smaeder received a telephone message from the Bank Detectives shortly after 1:00 p. m. on December 12, 1974, advising him that they had a man in their custody who had allegedly attempted to cash a stolen check. Inspector Smaeder arrived at the Bank Detectives' office at approximately 1:40 p. m. and saw the defendant sitting in front of Mr. Smith's desk. (N.T. 1–7). Inspector Smaeder knew the defendant as the result of a prior encounter about one month before, involving stolen mail. (N.T. 1–37). In connection with the prior incident, Inspector Smaeder had conducted three interviews with the defendant, during each of which the *Miranda* warnings were given. As a result of these interviews, the defendant signed a written statement similar to the one given in this case. (N.T. 1–33). From this prior involvement with the defendant, Inspector Smaeder testified that the defendant could read. (N.T. 1–32).

After greeting Inspector Smaeder, on December 12, 1974, the defendant began to explain the events leading to his apprehension by the Bank Detectives at Provident. (N.T. 1–8). Inspector Smaeder interrupted the defendant and gave him a waiver of rights form to read and sign. (N.T. 1–8).[2] Inspector Smaeder instructed the defendant to read the waiver of rights form and allowed the defendant enough time to do so. Then Inspector Smaeder asked the defendant to sign the waiver of rights form, if he had read the form and if he understood it. (N.T. 1–44, 1–45). At 1:53 p. m., the defendant signed the form. (N.T. 1–44).

Inspector Smaeder then took the defendant to an open office in another room and discussed the incident at Provident with him. The defendant orally explained his involvement with three of the checks in this indictment. This discussion lasted from 10–15 minutes. Inspector Smaeder then asked the defendant if he would give him a written statement and the defendant agreed to do so. (N.T. 1–17). Inspector Smaeder gave the defendant a second form on which to write the statement.[3] At the top of this second form is a printed statement which sets forth the constitutional rights which the *Miranda* decision requires that every defendant be made aware before custodial interrogation. (N.T. 1–17). Inspector Smaeder instructed the defendant to read the top of the form before writing his statement. After allowing the defendant enough time to read the top of the form and after he was convinced that the defendant had finished reading that portion of the form, Inspector Smaeder instructed the defendant to write his statement. The defendant then wrote in his own handwriting a three page statement which included each of the checks involved in the indictment. The statement contained the answers to questions asked by Inspector Smaeder, which answers were written by

2. A copy of the waiver of rights form is attached as exhibit GS–1.

3. A copy of this form is attached as exhibit GS–2.

the defendant. Each page of the three page written statement was signed by the defendant.

Under the Fifth Amendment, a suspect is guaranteed the right to remain silent and the assistance of counsel during in-custody interrogation, and evidence obtained in violation of these rights is inadmissible in a subsequent criminal prosecution. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966). The suspect may waive his rights, provided that the waiver is voluntary, knowing and intelligent. *Miranda* at 444, 86 S.Ct. 1602. In the context of custodial interrogation:

> a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Miranda* at 475, 86 S.Ct. at 1628.

The defendant contends that he could not have knowingly and intelligently waived his constitutional right to remain silent because he was never adequately apprised of that right. He argues that he was 18 years of age at the time of the arrest, had limited mental ability, and that the warnings required by *Miranda* were never read to him.[4] He contends that the Government has not met its burden when the testimony reveals only that the defendant was given a waiver of rights form to read, but was never orally informed of his constitutional rights.

It is axiomatic that an individual must know what his constitutional rights are and be aware of his available options before he can be said to intelligently waive those rights. *Collins v. Brierly,* 492 F.2d 735 (3d Cir. 1974).

It is further clear that a written and signed waiver is strong, though not conclusive, evidence that the required warnings were given, understood and voluntarily waived by the defendant. *United States v. Blocker,* 354 F.Supp. 1195 (D.C.D.C.1973). Whether a defendant understood his constitutional rights and voluntarily waived them depends upon the particular circumstances of each case, including the education, experience and conduct of the accused, as well as the credibility of the law enforcement officials involved. *Pettyjohn v. United States,* 136 U.S.App.D.C. 69, 419 F.2d 651 (1969). In this case we are satisfied that the Government has met its heavy burden and has proved by a preponderance of the evidence that the waiver was knowingly and intelligently made. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

The evidence in this case shows that the defendant had a similar involvement with Postal Inspector Smaeder about one month prior to the present incident and that the required warnings were read by Inspector Smaeder at that time. The defendant, although only 18 years of age, was considered by Inspector Smaeder to be "wise beyond his years". (N.T. 1–36). The defendant has a tenth grade education and Inspector Smaeder was aware of the fact that the defendant could read. (N.T. 1–32, 1–41). The defendant was given and signed two forms, each containing the *Miranda* warnings. He was given ample time to read each form. Furthermore, the defendant was told to sign the waiver of rights form only if he had read the form and understood it.

The defendant argues that the statement was taken by Inspector Smae-

---

4. At the trial, Inspector Smaeder testified that the defendant did read out loud the top portion of his confession which contained the *Miranda* warnings. (N.T. 3–63). The preferable course of action would have been for the Postal Inspector to read the waiver of rights form outlining the *Miranda* warnings aloud, or at least have had the defendant read the warnings aloud to the Inspector, rather than hand the form to the defendant and not require him to read it aloud. However, the latter procedure does not of itself lead to the conclusion that the Government has failed to establish its burden that the waiver was a knowing and intelligent one. See *United States v. Choice,* 392 F.Supp. 460 (E.D.Pa., 1975).

der when he had reason to doubt the defendant's "mental acumen". Inspector Smaeder did testify that he was concerned with the defendant's psychiatric condition. (N.T. 1–34, 1–35). However, Inspector Smaeder did not question the defendant's mental ability and the record does not disclose any evidence that the defendant was unable to understand any of the events which occurred during his apprehension and the custodial interrogation.

■ Finally, the defendant contends that the statement written by him was no more than the dictation of Inspector Smaeder. The record clearly reveals, however, that Inspector Smaeder asked the defendant questions and the defendant wrote his own answers in his own handwriting. (N.T. 1–38). The record reveals that the facts as recorded in the written statement could have come from no other source than the defendant.

■ The defendant next contends that his statement to Inspector Smaeder was the result of a statement originally elicited from the defendant by bank detective Smith without Smith having given the defendant his *Miranda* warnings. Mr. Smith testified that he asked the defendant if he was Barney Tratenberg and the defendant replied that he was not and said that his name was Willis. (N.T. 1–49). When asked how he came into possession of the check payable to Barney Tratenberg, the defendant responded that he had gotten it out of the mail. (N.T. 1–50). The defendant was then asked to accompany Mr. Smith to his office. (N.T. 1–50).

While it is true that bank detective Smith did not give the defendant the warnings required by *Miranda*, it is also true that such warnings are only required when there is a "custodial interrogation", which is defined by the Supreme Court as ". . . questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966). Assuming *arguendo* that the defendant was in custody, bank detective Smith had no official or de facto connection with any public law enforcement agency. He was an employee of the Philadelphia Bank Detectives, a private organization which protected private property in private banks. Furthermore, there is no hint on this record of any Governmental knowledge or instigation of, influence on, or participation in any of the actions surrounding the taking of the defendant into custody, which produced the statements to Mr. Smith.

■ The Fifth Amendment privilege against self-incrimination does not require the giving of constitutional warnings by private citizens or security personnel employed thereby who take a suspect into custody. *United States v. Golden*, 461 F.2d 998 (8th Cir. 1972); *United States v. Antonelli*, 434 F.2d 335 (2d Cir. 1970); *United States v. Fioravanti*, 412 F.2d 407 (3d Cir. 1969). The Federal exclusionary Rule enforcing adherence to the Fifth Amendment is a restraint upon the activities of sovereign authority and not a limitation upon other than government agencies. *United States v. Antonelli, supra.*

Since the questioning by Mr. Smith was not custodial interrogation by a law enforcement officer, *Miranda* is not applicable and no warnings were required. *United States v. Casteel*, 476 F.2d 152 (10th Cir. 1973); *United States v. Fioravanti, supra.* Moreover, since there is no "poisonous tree" the statement made to Inspector Smaeder cannot be a "fruit" and the defendant's contention that his statement to Inspector Smaeder was the result of unlawful conduct by the bank detectives must be rejected.

Accordingly, the following Order is entered:

## ORDER

And now, this 7th day of July, 1975, upon consideration of the defendant's Motion for a New Trial, it is hereby ordered that the Motion is denied.

Exhibit GS–1

## UNITED STATES POSTAL INSPECTION SERVICE
## WARNING AND WAIVER OF RIGHTS

Place: *Bank Detective Agency*
*Phila, Penna.*

Date: *12/12/74*  Time: *1:53*

## WARNING

BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

- You have a right to remain silent.
- Anything you say can be used against you in court.
- You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
- If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

## WAIVER

I have read this statement of my rights (This statement of my rights has been read to me) and I understand what my rights are. I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

*Tony Willis*
(Signature)

*1:53*   *12/12/74*
(Time)   (Date)

Witnessed by: *E. Pomeroli Jr*
Title: *Postal Inspector*
Witnessed by: *Ralph Smith*
Title: *Phila Bank Det.*

Exhibit GS 2

PLACE: Philadelphia, Pennsylvania
DATE: 12/12/74
TIME: 2:10 PM

I, _____Tony Willis_____ have been advised by
Postal Inspector E.D. Smeader that I have a right to
remain silent; anything I say can be used against me in court; I have
a right to talk to a lawyer for advice before any questioning and to
have a lawyer with me during questioning; if I cannot afford a lawyer,
one will be appointed for me before any questioning if I wish; that if
I decide to answer questions now without a lawyer present, I will still
have the right to stop answering at any time; I also have the right to
stop answering at any time until I talk to a lawyer. I understand what
my rights are. I am making this statement of my own free will. No
promises or threats have been made to me to get me to make this statement.

Between 12:30 and one o'clock I went to the Provident Natl. Bank and attempted to cash Arsen Kashkashian Jr. Check no. 5451 dated 12/10/74 in the amount of two hundred and five dollars and payable to Barney Tratenburg I endorsed the check with the name of the payee and handed to the teller to cash I showed an identification card which I had made up o in the name of the payee. The teller asked me to wait and a short while later I was confronted by Philadelphia Bank Detectives who asked me to go with them to there office I got this check from the mail rack in the lobby of the build at 1211 Chestnut

Tony Willis 12/12/74

Statement of Tony Willies

On 12/11/74. for the past two or three weeks I have been taking mail from office buildings in Center City Phila. on a daily basis I've cashed aproximatley ten checks which I got out of the mail I estimate that I got about $5000.00 dollars from this operation On December 12th I opened an account at Central Penn National Bank at 16th & Chestnut with fifteen dollars cash in the name of Julian F. Ulmer the same day I deposited a check payable to Julian Ulmer into the account at Central Penn Bank at 9 chestnut I have been shown. United National Insurance Company Check no. 53510 payable to Panfilo Ferrino Dated Nov 22, 1974 amount $1000.00 dollars and Check no 5337, payable to Aaron Wiesman Date November 27, 1974 $105.00; I got both of these checks out of the mail at 220 south 16th st. I endorsed each of the check with the name payees an cashed them at the I.N.B. Bank at 1518 Walnut st I used Identification cards which I had made with the name of the payees.

Tony Willies  12/12/74

This statement of three pages is made voluntarily it is true to the best of my knowledge or belief. So help me help me god.

_Tony Willie_ 12/12/74

SUBSCRIBED AND SWORN TO BEFORE ME THIS 12TH DAY OF DECEMBER, 1974 AT PHILADELPHIA, PA

E. _____ Jr.
Postal Inspector