**UNITED STATES of America, Plaintiff,**

v.

**Hayward Leslie BROWN, Defendant.**

**Crim. No. 74–81692.**

United States District Court,
E. D. Michigan, S. D.

Sept. 25, 1974.

See also D.C., 384 F.Supp. 1151.

Ralph B. Guy, U. S. Atty. by Gordon S. Gold, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Sheldon Halpern, Kenneth Mogill, Detroit, Mich., for defendant.

**OPINION AND ORDER DENYING MOTION TO SUPPRESS CONFESSION**

CORNELIA G. KENNEDY, District Judge.

Defendant has moved to suppress any oral admissions made subsequent to his ar-

rest on January 12, 1974. He claims, first, that no such admissions were in fact made by him and, second, that if they were made they should be suppressed because of violation of his Constitutional rights.

Defendant further urges that The Honorable Samuel C. Gardner, a judge of the Recorder's Court of the City of Detroit, has previously ruled that these oral admissions should be suppressed and that this Court is bound by Judge Gardner's decision. As the Court held at an earlier hearing on this motion, it is required to make an independent review of the matter; it is required to hear evidence and make its own findings of fact and conclusions of law thereon. *Elkins v. United States,* 364 U.S. 206, 223–24, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *United States v. Beigel,* 370 F.2d 751, 756 (2d Cir.), *cert. denied,* 387 U.S. 930, 87 S.Ct. 2049, 18 L.Ed.2d 989 (1967). Indeed, some of the evidence presented to the Court was not presented to Judge Gardner.

The Court has now heard the evidence presented by the Government in support of its contention that oral admissions made shortly after defendant's arrest and while he was in the police car being conveyed to police headquarters were voluntary, and the defendant's evidence, both of his witnesses and by way of cross-examination of the Government's witnesses, as well as exhibits, that these admissions were not voluntary and that they were not even made. There has been some reference in the testimony to a later statement made at police headquarters but the Government states it does not intend to offer that and the Court makes no finding as to its voluntariness.

Four persons were present in the police car which conveyed defendant from the place of his arrest on Trumbull south of Warren in the City of Detroit, to police headquarters at 1300 Beaubien in downtown Detroit. They were police officers Ciaglo and Gilbeau, police sergeant Studer and defendant. All four have testified.

Sergeant Roger Studer testified that he responded to Trumbull and Warren after hearing a radio message that a man wanted for shooting at Wayne State University police officers was in custody. When Sergeant Studer arrived, defendant was already seated in the police car. An Inspector Bensmiller directed Studer to accompany defendant to police headquarters. Sergeant Studer described defendant as handcuffed, breathing heavily, perspiring profusely and having an abrasion on his right cheek, with slight bleeding, but no other visible injury. Studer entered the police car which almost immediately left the scene. He testified that he first asked defendant what happened to his face. To this, he testified, defendant replied that he fell in an alley while running from the police. He testified that defendant did not complain of any injuries and received no injuries while in the police car; that he did not complain of pain; and did not ask for medical attention. Studer further testified that shortly after he entered the police car defendant said, "Don't let them beat me, Sarge," to which Studer replied, "No one is going to hit you."

Sergeant Studer asked defendant his name, to which defendant replied Hayward Leslie Brown and volunteered, "I'll tell you everything you want to know." Studer then gave defendant his *Miranda* warning or advice of Constitutional rights. Defendant stated, according to Sergeant Studer, that Studer did not need to give him his advice of rights since he, defendant, knew them.

Sergeant Studer testified that defendant then told him that he and one Bethune had just fire-bombed a place on Woodward, that they were running from the police and that Bethune had shot at the police but that he, Brown, had never shot anyone; that Bethune shot the STRESS officers.

Sergeant Studer testified he asked Brown why they had fire-bombed the place on Woodward and that Brown replied, "We wanted to get something started like down in New Orleans, to free the people."

Sergeant Studer asked Mr. Brown where Bethune was and was told that he was staying out on Schaefer but that defendant did not know the cross street. Studer testified that defendant was excited and nerv-

ous, that he was breathing heavily, and that he thrashed around in the police car, throwing his shoulders around from time to time.

Sergeant Studer further testified that at about the same time defendant told him his name he, Studer, thought, "I've seen him before." (Defendant, Bethune and one Boyd had been the subjects of a massive manhunt following the shooting of police officers in December of 1972.)

Officer David Gilbeau was seated on the other side of defendant in the rear of the scout car. He testified that defendant had a scrape on his cheek or forehead with slight bleeding, that he was sweating and somewhat nervous. He testified that when someone asked defendant his name that defendant said Hayward Brown. Gilbeau looked at the flyer in the police car and noted it was quite different from defendant's actual appearance because his face was fuller. Gilbeau's recollection of the admission was not as complete as Studer's but he did recall Mr. Brown's saying that Boyd and Bethune shot the STRESS officers and that he, Brown, had nothing to do with it. He recalled Mr. Brown's saying that Boyd was staying someplace on the west side. He recalled Sergeant Studer's giving defendant his advice of rights and defendant interrupting. He also recalled the remark about the bombing being done to "free the people like in New Orleans."

Officer Gilbeau testified that while in the police car he struck defendant once in the face with his open hand to get defendant to be still. He testified defendant was sitting forward, screaming, and Gilbeau wanted to hear what was being said on the police radio. He did not believe Sergeant Studer saw this occur. He further testified that this slap did not leave any mark on defendant's face and that defendant at no time complained of being in pain.

The third officer in the police car was Ciaglo who was driving. The driver's seat was separated from the rear seat by a plastic, bullet-proof shield which made it difficult for him to hear what was occurring in the back seat, although the porthole in the glass was open. He testified that he was not aware of defendant's identity until defendant told him his name. He testified that defendant's picture in the "Wanted" circular was not a good likeness of his appearance. Ciaglo testified that defendant had an abrasion on the right side of his face, which he had had prior to his arrest and that this was the only visible injury; that defendant was breathing heavily and sweating, and that he heard defendant say something about being involved in the bombing of a Big Boy Restaurant. He further testified that he was one of two officers who had helped defendant to the scout car and that defendant entered under his own power.

Defendant also testified to the events in the police car. He denied making any statements whatsoever about any firebombing and denied even knowing about the events in New Orleans until long after his arrest. He admitted that he was given his advice of rights and that he was fully aware of his right to remain silent, to have a lawyer, etc. He testified that he did give the sergeant his name and address and that he may have told him that Boyd and Bethune were staying on Schaefer. He denied ever having said that he got the scrape or abrasion on his right cheek from falling in an alley, although he admitted he had been running from the police. He had been, he said, in the vicinity of the Big Boy Restaurant and the Planned Parenthood office when the bombing occurred and when he learned of it, he "split." He admitted having fired at Wayne State University police officers at two locations and to having run a long distance. He testified that he was never unconscious during the ride downtown and that there was no period of time for which he could not account. He also described this period as a period of rest. He denied saying that he would tell the officer in the police car "anything you want to know." He testified that during the trip from the scene of the arrest to the police station he was punched and struck both in the body and about the face and head, several times by each of the officers in the rear of the scout car.

Mr. Brown further testified that before being placed in the scout car he had been repeatedly beaten, kicked, struck with flashlights and rifle butts while being arrested. He testified that he was walking on Trumbull just south of Warren when he was ordered to halt; that he in no way resisted arrest and that while his hands were in the air he was thrown to the ground and subjected to the foregoing by several police officers. He testified that he was dragged from the sidewalk where he was arrested to the police car. He testified he was struck again several times at the police garage after arriving at police headquarters and received further blows, including a kick in the face, while being interrogated at headquarters. He also testified that at police headquarters a police officer deliberately burned the upper surface of one of his hands, singeing the hair.

Mr. Brown acknowledged that although he was examined by two doctors that same evening he made no complaint to them about any injuries below the neck except for a minor cut on one wrist and the area on the hand where the hair was singed. Moreover, although he testified that the blows he received caused bruises, he did not complain of them to the doctor when he was seen again a few days later.

The United States called as witnesses eleven City of Detroit police officers (including the three already referred to) who were present at the scene of defendant's arrest on Trumbull Avenue. These officers included at least five who actually participated in the arrest. Although there were minor discrepancies in the testimony of these officers, they were in agreement that the defendant was walking north on Trumbull when first observed by officers Boice, Ciaglo, Jagoda and Gilbeau; that when commanded by Officer Boice or Ciaglo to halt, that defendant did so and raised his hands. Officers Boice and Jagoda testified that as Officer Boice was searching the defendant, defendant lowered his left arm about the time that Officer Boice found a gun in defendant's pocket. Officer Boice testified that when defendant's left arm hit Boice's shoulder he grabbed Mr. Brown by

the back of the collar and kicked his legs out from under him, forcing him to the ground. Both Officer Boice and another of the officers testified that this was not done gently. Officer Boice knelt with his knee in defendant's back, Officer Ciaglo testified he was holding defendant's head, while Officer Jagoda was lying across his legs. Officer Yankovich, who came from a cruiser car that stopped at the corner of Trumbull Avenue and Hancock Street (which is the street immediately south of Warren Avenue) testified that he came upon the struggle and aided in placing handcuffs on Mr. Brown. Three other officers from the cruiser car testified that they arrived at various times before Mr. Brown was taken from the scene. All of these officers denied kicking Mr. Brown, striking him with a flashlight, or any other weapon and denied seeing anyone else do so. Officer Ciaglo testified that he did observe a rifle butt placed against defendant's shoulder while defendant was struggling on the ground and Ciaglo testified that he may have struck defendant once with a clenched fist during the struggle. All the other officers denied striking defendant with a closed fist. The officers were in agreement that defendant was able to walk to the police car after being pulled to his feet and that he was escorted to the police car by two officers, one on each arm. Those officers who observed defendant's face after he was subdued testified that he had an abrasion on his right cheek. Officers Boice and Ciaglo testified that defendant had this same abrasion before he was forced to the ground. The officers at the scene denied seeing any other evidence of injury. Each one of the officers had good records with the department.

In addition to the police officers, the Government called four citizens, Frances and Mose Dotson, Bernatta Ramage and Floyd Gourley, who lived on Trumbull and whose premises were close to the location where the arrest occurred and from whose homes the events could be observed. Their testimony was in substantial agreement with that of the officers to the extent they observed the events.

The testimony of Sergeant Studer as to defendant's physical condition in the scout car was corroborated by Inspector Alfred Bensmiller, who also arrived at the scene of the arrest after defendant was in the police car but before Sergeant Studer. Bensmiller testified that he opened the door of the police car in which defendant was sitting. He observed that defendant was sweating and that he had a mark and blood on the right side of his face. He asked defendant his name to which defendant responded with a first name other than Hayward and the last name of Brown. He asked defendant if he were Hayward Brown and defendant replied, "No, that is my brother." He testified that defendant had no difficulty in speaking and that there was nothing to indicate defendant was in pain.

Certain testimony of Mrs. Frances Dotson supports the conclusion that Mr. Brown received the scrape or mark on the right side of his face when he fell, running from the police. Mrs. Dotson testified that shortly before defendant was arrested she heard her police dogs barking in her fenced rear yard. She went to her rear door and saw that one of her dogs was gripping the coat of a black male who was climbing the fence to exit the yard. She called the dog off, the man fell to the ground and then got up and left her view, proceeding toward Trumbull. She did not see the man's face but the coat he was wearing was identical to the coat being worn by the man she saw placed in the police car in front of her house a few minutes later. Her husband, who was in the front of the house, heard the dogs barking and saw the same man who was a short time later arrested and placed in the police car, come from between his house and the house to the north of him. The Court finds this person was defendant.

Defendant's testimony that he was severely beaten and kicked at the scene of his arrest was corroborated by the testimony of Morris Thomas and Shirley Brown, two citizens who testified they were in a car parked in a Shell gas station on the northwest corner of Trumbull and Warren. They testified that from that distance they could observe Mr. Brown being kicked and struck while he lay on the ground; that they saw him being thrown to the ground after he was already handcuffed. They testified that they saw Mr. Brown dragged to the police car in what might be described as a backwards fashion, his head up and facing to the rear of the direction he was traveling and his feet and legs dragging. They further testified that the police car with Mr. Brown in it remained at the scene after traffic was permitted to resume and that they drove by the police and observed that Mr. Brown appeared to be unconscious. (The area had been blocked by a number of police cars, according to all witnesses, and the Government's witnesses testified that the car with Mr. Brown in it left shortly after his arrest.) These witnesses did not report their observations to any authority. They reported what they saw to Mr. Thomas' sister-in-law, an employee in the office of one of defendant's attorneys in state court proceedings, and through this means their presence and observations became known. It should be noted that Shirley Brown is in no way related to the defendant.

Both Mr. Thomas and Miss Brown testified that the arrest took place north of a driveway on the west side of Trumbull which is just north of the first house on that side. All of the police officers and the neighbors who testified placed the arrest south of this driveway. Officer Selmi testified that when he arrived at the scene he drove his police car part way into this driveway, and that the altercation or arrest was taking place to the south of him. It would not be possible for anyone in the gas station to see what was occurring on the sidewalk to the south of this car if it were parked in the driveway as Officer Selmi indicated. Selmi was certain of the location and, indeed, when he backed out of this driveway, he testified, he struck and damaged Inspector Bensmiller's car. The defendant testified that there may have been a car in this driveway.

Based upon all of the testimony it heard, the Court finds that the arrest occurred south of this driveway.

Defendant also offered testimony of two of his attorneys, Geoffrey Taft and Richard Soble, and of two other police officers, Robert Taylor and Gilbert Hill, as to his physical condition and mental state later in the day at Detroit Police Headquarters. The attorneys and Officer Hill testified that defendant's face bore the marks of a beating and the attorneys testified that Mr. Brown was crying and distraught at various times and appeared to have been severely beaten.

Two physicians who examined defendant that evening at the county jail testified as to defendants condition at that time. The Government called Dr. Guindi who testified that he examined defendant about 4:30 p.m., after his arraignment. Using the report [Exhibit No. 15] he made at the time, which he stated was accurate and in his own handwriting, he testified that defendant had abrasions on the cheek, nose, chin, upper lips and a laceration of the wrist and tongue. He classified the injuries as minor. Except for the chin, tongue and wrist these injuries can be seen in Exhibit No. 24.

Defendant called Dr. Lebedovych who testified that his records disclosed that he also examined defendant that same evening. Dr. Lebedovych sutured the laceration of the chin but stated that whether it needed suturing was a matter of opinion. (Dr. Guindi had observed it but had not sutured it.) He observed multiple abrasions of defendant's face. He described an abrasion as the rubbing off of the top layer of skin. At the time he examined Mr. Brown he believed Brown had been beaten. However, he testified that the injuries could have been caused by striking or scraping the face on the sidewalk but it would have required more than a single fall or blow. He testified defendant told him that a police officer had held a lighted cigarette to his hand to get him to talk. However, Dr. Lebedovych testified the singeing of hairs he observed could not have been caused by a cigarette. (At the hearing defendant claimed that the burning or singeing was caused by a cigarette lighter. However, Dr. Lebedovych was certain that it was defendant's claim, when he examined him, that it was a lighted cigarette.) He testi-

fied that after he learned from the newspapers the defendant had been accused of participating in fire-bombing he felt defendant was being manipulative and defendant admitted as much with respect to some later claims of headache.

A great deal of the testimony the Court heard related to events or observations which occurred subsequent to the making of any admission in the police car. This evidence is relevant only as it tends to support or impeach the credibility of the witnesses, or as it tends to show defendant's condition at the time he was in the police car. The question of the amount of force used in subduing defendant is relevant only insofar as it, too, bears on his condition and state of mind when he made the statement or aids in weighing the credibility of defendant and officers Gilbeau, Ciaglo and Studer. The central question on this motion is whether the Government has proved by a preponderance of the evidence that defendant was advised of his Constitutional rights, knowingly waived them and voluntarily gave a statement.

This standard as to the burden of proof as to the voluntariness of a confession which the Government must meet was set by the United States Supreme Court in *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). It held that a district court need be satisfied "only by a preponderance of the evidence," as opposed to a standard of proof beyond a reasonable doubt.

The question of voluntariness in the instant case is complicated by the fact that defendant denies ever having given the statement attributed to him. Ordinarily it is the fact-finder at the trial who determines if a statement was in fact made and what was said.

The factors which a court should consider in determining whether a confession or admission is voluntary have been set forth in a number of cases. In *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Court held:

> In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all

the surrounding circumstances—both the characteristics of accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused . . . lack of education . . . low intelligence . . . lack of any advice to the accused of his constitutional rights . . . length of detention . . . repeated and prolonged nature of questioning . . . and the use of physical punishment such as the deprivation of food or sleep . . . .

Other factors were mentioned in *Culombe v. United States*, 367 U.S. 568, 601–602, 81 S.Ct. 1860, 1878, 6 L.Ed.2d 1037 (1961):

. . . extensive cross-questioning [of the defendant] . . . undue delay in arraignment . . . failure to caution a prisoner [as to his Constitutional rights] . . . refusal to permit communication with friends and legal counsel . . . the duration and conditions of detention . . . the manifest attitude of the police toward him, [and] his physical and mental state . . . .

Defendant urges that the attitude of the police officers here, as well as the police department generally, was so antagonistic toward him, because he was believed to have been responsible for the murder and shooting of police officers, that his confession was involuntary. The Court believes the testimony of the police officers that they were unaware that their prisoner was Hayward Brown until he was in the police car. Thus, it is only the manifest attitude of officers Gilbeau and Studer which is relevant. It is also significant that defendant does not himself claim that the manifest attitude of hostility by the police caused him to say anything. It is his attorney who argues that it would have that effect.

Defendant, although young, had had prior contact with the police. By his own testimony he had been on his own since he was fourteen. Moreover, as to the one statement he concedes he may have made in the police car—that Boyd and Bethune were staying on Schaefer—his own testimony is that this information was deliberately given to mislead the police and was false. Although his statement that it was deliber-

ately given to mislead the police referred to his giving the information at a later time that day, it is equally probative that his will was not overborne in the police car.

Defendant does not claim that he had been held incommunicado, had been subjected to prolonged questioning, had any mental problems, was lacking in intelligence or was tricked into giving the confession. In addition to the hostile attitude of the police it is his claim that he had been subjected to clear brutality by the police during his arrest and while in the police car or that in any event he had received severe injuries to his person prior to the time of the confession.

██ The testimony of Mr. Brown that he was struck about the head and kicked and beaten below the neck at the time of his arrest and the testimony of the arresting officers that this did not occur cannot be reconciled. The Court must determine, therefore, which witnesses it will believe. Among the factors which lead the Court to reject Mr. Brown's testimony are his admitted failure to complain of these injuries to either doctor, and the doctors' testimony that they did not observe such severe injuries. Mr. Brown explains his failure to mention these injuries as being due to a desire to withdraw. However, he complained to the doctors of much less significant injuries. Dr. Guindi's examination, according to Mr. Brown's own testimony, was conducted while the defendant was not wearing a shirt. Blows of the type described by Mr. Brown would have to leave marks. Moreover, defendant did not mention these serious injuries to Dr. Lebedovych when the doctor examined him a few days later. A bruise of any significance would still have been present then. The Court is compelled to reject Mr. Brown's testimony regarding being kicked and beaten while on the sidewalk. The testimony of officers Boice, Ciaglo, Jagoda, Studer, Bensmiller, Yankovich, as well as the private citizens who resided on Trumbull, is persuasive. The Court finds that defendant had not been subjected to a severe beating at the time he made the admission and that although he had been involved in a fall and scuffle in which he may have received some

injuries they were relatively minor in nature.[1]

Defendant did receive some injury before he was placed in the police car; however, the Court finds they were minimal. All the witnesses agree he had an abrasion on his right cheek. This is shown in the photograph [Exhibit No. 24] and was visible in the T.V. films which the Court saw. The photos [Exhibits Nos. 16, 17 and 24] also show that defendant had an abrasion on his nose and that his lips were swollen. In the Court's opinion, the injury to the mouth probably occurred when defendant was forced to the sidewalk and struggling there with the police. The testimony of the officers at the scene that they did not observe any other injuries than the abrasion of the right cheek is not inconsistent since it is common knowledge that it takes some time for swelling to appear. The doctors who examined defendant that evening testified he also had a laceration of the chin. Even if that injury also occurred at the time of arrest, it, as well as the other injuries to the face, is minor, as is the slight laceration on the right wrist.

Defendant's claim he did not make a statement is one of the factors to be considered in weighing his credibility. That the police officers would fabricate the confession here, dealing as it does with a firebombing, when they believed defendant had murdered and shot police officers defies belief. Memoranda or reports containing the defendant's statement were made that same day.

The Court finds that the abrasion on defendant's face occurred when he was running from the police, as he told Sergeant Studer, and that except for the slap to which Officer Gilbeau testified, defendant was not struck while in the police car.

The Government has established by a preponderance of the evidence that any admissions defendant made while in the police car were made voluntarily.

For the foregoing reasons the motion to suppress the confession is DENIED.

IT IS SO ORDERED.

---

1. Defendant asks the Court to apply the ruling of the Court of Appeals for the District of Columbia in *Payton v. United States,* 96 U.S. App.D.C. 1, 222 F.2d 794 (1955). That court held that where "violence at the hands of the Police admittedly had occurred within about an hour," even if the force used was justified, a "confession made in such circumstances, and thereafter repudiated by the accused, should not be admitted in a criminal trial in a Federal court." The opinion does not fully describe the accused's condition but indicates that the accused had been bleeding after his arrest and had blood on his shirt and that the bleeding resulted from subduing the accused when first arrested and, again, at the station.

Applied to the facts of the particular case before it, the court's conclusion that the confession could not have been voluntary may well have been correct. But it does not logically follow that because an accused received some injury at the hands of the police when he was arrested, all his statements thereafter are involuntary. Whether they are voluntary or involuntary must depend upon the totality of the circumstances—including whether the statements are volunteered or the result of questioning and whether the injuries are slight, moderate or severe. Whether there is bleeding or no bleeding is also only one of many circumstances bearing on an accused's state of mind.