**UNITED STATES of America**

v.

**James Elwood MORRIS, Jr.**

**Crim. Nos. 180–31, 180–32.**

United States District Court,
S. D. Georgia,
Augusta Division.

April 14, 1980.

J. Michael Faulkner, Asst. U. S. Atty., Augusta, Ga., for plaintiff.

Grace E. Evans, Asst. Federal Public Defender, Augusta, Ga., for defendant.

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OF STATEMENTS

BOWEN, District Judge.

Currently pending in these criminal cases is the motion of defendant James Elwood Morris, Jr. to suppress oral admissions made by him to law enforcement officers while in custody on February 1, 1980. An evidentiary hearing on this motion was held on March 26, 1980, and the Court makes the following findings pursuant to Fed.R. Crim.P. 12(e).

Defendant Morris was arrested and taken into custody on February 1, 1980, pursuant to an arrest warrant for armed bank robbery. The arrest was made by Lloyd Buck, Special Agent of the Federal Bureau of Investigation [FBI], in the company of four other officers. While frisking defendant for a weapon, and subsequently finding a .25 caliber automatic pistol, Agent Buck advised defendant of his rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant made no statement; he was handcuffed and placed in the rear seat of an FBI vehicle.

At the request of the case agent in charge of the case, Allen Byron Gilbert, Special Agent, FBI, Morris was transported to his residence. During the course of this trip, which lasted approximately 15 minutes, defendant was told the reason for his arrest, and the *Miranda* warnings were read to him. Asked whether he wanted to say anything, defendant responded negatively. No further questions were asked at that time.

Upon arrival at defendant's residence, a mobile home, Morris was taken inside. Several other FBI agents were at the mobile home executing a search warrant; these agents took custody of defendant. Defendant was handcuffed and seated in the living room of his residence when Agent Gilbert, one of those conducting the search, read the *Miranda* warnings to him. Agent Gilbert was not told of defendant's previous statement that he did not want to talk.

Morris was asked whether he understood his rights and he responded affirmatively; no waiver of rights was signed. Agent Gilbert also asked whether defendant was willing to answer some questions. Morris' qualified response was that it depended on the question. Thereafter, Agent Gilbert took some general identification information from defendant. Morris was further informed of the charges against him and shown the items seized during the search. The defendant testified that Agent Gilbert said they had him cold when he was shown these items. The testimony of Agent Gilbert was that he possibly said something to that effect but could not recall. Defendant's response was to deny any involvement in the robberies.

Defendant testified that during the course of this colloquy he stated: "Didn't you say I could have a lawyer?" This testimony was not expressly controverted. Agent Gilbert and Special Agent Roy Thomas Smith, Jr., who was also present at this time, testified that defendant never directly asked for an attorney.

After approximately 20 minutes at the mobile home, defendant, still handcuffed, was transported to the FBI office by Agent Smith and another FBI agent for the purpose of arranging an appearance before the United States Magistrate. During the drive which lasted 15 to 20 minutes, Morris was reminded that the *Miranda* warnings previously given still applied, specifically his right to remain silent. Defendant made no response and no indication that he wanted to make a statement.

Agent Smith proceeded to ask some questions. The tenor of these questions was as

follows: Have you been in trouble before?; Are you employed?; What is your status with the Army?; and, What would your father [a police officer] think about this? Agent Smith also told defendant that the FBI had a surveillance photograph of the robber and that it resembled him. Morris denied the robbery.

During this discussion, Agent Smith told Morris that an attorney would be provided for him. Asked whether he had an attorney or would need a public defender, defendant replied that he couldn't afford an attorney. Agent Smith later told the Magistrate's office that a public defender would be required.

Once at the FBI office, Morris, still handcuffed, was seated at a desk not in use and Agent Smith was immediately opposite him at a desk with a telephone. Another agent was also present. Agent Smith told defendant the *Miranda* warnings from memory. Morris made no indication he wanted to talk.

Agent Smith placed the surveillance photograph in front of Morris and stated: "This looks like you to me;" he then made a phone call. Defendant testified that he responded the photograph was not of him, but that it must be of his twin brother [said facetiously]. Thereafter, defendant specifically asked to see the photo again. After being shown the photograph, defendant made oral admissions that the photograph was of him and that he robbed the two banks. Defendant also provided some details of the robberies and identified money found at his residence as the proceeds. No notes were made of these oral admissions by the agents.

The foregoing series of events began at approximately 2:18 p. m. on February 1, 1980, and terminated at 3:29 p. m. the same date. Thus, the time span was approximately one hour and fifteen minutes. Defendant then appeared before the Magistrate.

Defendant Morris is a twenty-two year old black male with a [G.E.D.] high school education. Testimony adduced at the hearing revealed that defendant is immature for his age; yet he is not unintelligent. On direct examination, defendant evinced a conversant understanding of polysyllabic words such as "transpired", "transported", and "acknowledged."

■ The proper analysis in determining the admissibility of a confession is threefold: first, whether the protective guidelines delineated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) to secure the Fifth Amendment privilege against self-incrimination were scrupulously honored; *see generally Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); second, whether defendant voluntarily, knowingly and intelligently waived the rights enumerated in the *Miranda* warnings; third, whether defendant's eventual confession was the result of a voluntary decision. *See Johnson v. State*, 425 F.Supp. 538, 545–46 (D.Md.1976).

■ In considering these issues, the initial burden rests with defendant to present evidence challenging the legality of the confession. *See United States v. Crocker*, 510 F.2d 1129, 1135 (10th Cir. 1975). To show admissibility, the government must carry the counterveilling burden that constitutional standards have been satisfied by a preponderance of the evidence. *United States v. Watson*, 469 F.2d 362 (5th Cir. 1972). This quantum of evidence has uniform application to the constituent parts underlying admissibility. *See id.* at 364; *see also United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir.), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977) as to burden of persuasion where interrogation is custodial.

■ As outlined above, one constituent part of admissibility is the voluntariness of the confession. The Supreme Court has indicated that the appropriate standard in judging voluntariness is whether "the confession was 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influ-

ences.'" *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (quoting *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897)). Yet this test is not readily applied. As stated by the Fifth Circuit in *Jurek v. Estelle*, 593 F.2d 672, 676 (5th Cir. 1979):

> In its efforts to define how much pressure is too much [causing an involuntary response], the Supreme Court has only concatenated metaphors. To be voluntary, a confession must be "the product of an essentially free and unconstrained choice." *Culombe v. Connecticut*, 367 U.S. 568, 602 [81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037] (1961). The decision to confess must be "freely self-determined," *Rogers v. Richmond*, 365 U.S. 534, 544 [81 S.Ct. 735, 5 L.Ed.2d 760] (1961). "The product of a rational intellect and a free will," *Blackburn v. Alabama*, 361 U.S. 199, 208 [80 S.Ct. 274, 280, 4 L.Ed.2d 242] (1960). The defendant's "will to resist," *Rogers v. Richmond*, 365 U.S. at 544 [81 S.Ct. 735] must not be overborne; nor can his "capacity for self determination [be] critically impaired, *Culombe v. Connecticut*, 367 U.S. at 602 [81 S.Ct. 1860].

Ultimately, voluntariness turns "on the effect of the totality of the circumstances on the defendant's will." *United States v. Ballard*, 586 F.2d 1060, 1062 (5th Cir. 1978), and requires an assessment of human motivation and behavior. *Id.* at 1063.

■ Reviewing the circumstances in the instant case reveals that defendant is an adult with sufficient verbal intelligence to understand questions and the import of his answers, and not be susceptible to influence and suggestions. *Cf. Sims v. Georgia*, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967). Further militating against a finding of involuntariness was evidence that no coercion was used by law enforcement officers. Moreover, defendant's nervousness in the FBI office, *see United States v. Arroyave*, 477 F.2d 157, 161 (5th Cir. 1973), his feelings and thoughts of causing embarrassment to his father, *see United States v. Shelby*, 573 F.2d 971, 975 (7th Cir.), *cert. denied*, 439 U.S. 841, 99 S.Ct. 132, 58 L.Ed.2d 139 (1978) and his perception that

FBI agents were "not smiling and looked mean", *see United States v. Brown*, 436 F.Supp. 998, 1004 (E.D.Mich.1977), do not establish involuntariness. Nor does the oral rather than written nature of the statement, in itself, render the confession inadmissible. *See United States v. Pollard*, 509 F.2d 601 (5th Cir.), *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975).

■ Defendant testified that FBI agents told him: "if you cooperate, it will go easy on you," and further told him the possible penalties for armed robbery. Assuming *arguendo* such statements were made, this does not render the subsequent confession involuntary. "[T]elling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government." *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) (citing inter alia *United States v. Frazier*, 434 F.2d 994 (5th Cir. 1970); *Rivers v. United States*, 400 F.2d 935 (5th Cir. 1968)).

■ Based upon the totality of the circumstances, the Court concludes that defendant's confession was the result of a voluntary decision.

This finding of voluntariness, however, does not render the confession admissible if defendant did not make a knowing and intelligent waiver of his constitutional privileges as set forth in the *Miranda* warnings. *See United States v. Montos*, 421 F.2d 215, 222 (5th Cir.), *cert. denied*, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1975). *See also Johnson v. State of Maryland*, 425 F.Supp. 538, 547 (D.Md.1976). As the *Montos* court stated: "To be valid, a waiver must be made voluntarily and may not be presumed 'simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.'" 421 F.2d at 224 (quoting *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966)) (citation omitted). *See Government of Canal Zone v. Sierra*, 594 F.2d 60, 65 (5th Cir. 1979).

Defendant in the present case never signed a waiver form or expressly stated he waived his constitutional privileges. The three times defendant was questioned prior to his confession were initiated by law enforcement officers. The first and third time defendant was given the full *Miranda* warning (during his transportation to and from his residence), he said he did not want to talk or made no response. The second time defendant made a limited response that he would answer questions depending upon their content. While an express waiver is not required, see *United States v. James*, 528 F.2d 999, 1019 (5th Cir.), *cert. denied*, 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976), "implied waivers are clearly disfavored." *United States v. Hernandez*, 574 F.2d 1362, 1371 (5th Cir. 1978).

A central concern bearing upon knowing and intelligent waiver is whether the mandate of *Miranda* was transgressed. "[A] *Miranda* transgression lessens the probability that rights were voluntarily waived." 574 F.2d at 1372. Thus the final question is whether the procedural safeguards of *Miranda* were scrupulously honored by law enforcement officers.

As stated by the Fifth Circuit Court of Appeals in *United States v. Hernandez*, 574 F.2d 1362, 1367 (5th Cir. 1978): "*Miranda*'s salutary prophylactic prescription was designed to combat the inherently coercive atmosphere of a police-dominated, in-custody interrogation." The operative passage of *Miranda* is as follows:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege.

384 U.S. at 473, 86 S.Ct. at 1627–1628. This right to cut off questions must be scrupulously honored. *See Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975).

In the instant case, the *Miranda* warnings were read to defendant shortly after his arrest while he was being transported to his residence. At this time, defendant responded that he did not wish to talk. The questioning ceased but was resumed approximately 15 minutes later by another FBI agent after defendant was again informed of his rights. The issue presented is whether defendant's right to cut off questioning was scrupulously honored.

The Supreme Court considered under what circumstances a resumption of questioning is permissible after the right to silence has been invoked in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The *Mosley* Court rejected a blanket prohibition against resumption of questioning, and indicated instead that a case-by-case approach was necessary. The Court concluded that since "the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation," *id.* at 106, 96 S.Ct. at 327, the incriminating statement was admissible. Thus factors such as passage of a substantial period of time, subsequent questioning on a distinct charge, or the discovery of new and different facts favor admissibility. *See United States v. Mearns*, 443 F.Supp. 1244, 1253 (D.Del.1978).

As applied to the statements of defendant Morris, these elements do not support admissibility. After initially invoking his right to remain silent, defendant was questioned by law enforcement officers on three subsequent occasions within the span of one our. Although each period of questioning was prefaced with a renewal of the *Miranda* warnings, this is not necessarily curative. The Fifth Circuit has recognized:

The more times police inform a suspect of his rights in the face of his repeated invocation of one of those rights—the right to remain silent—the clearer it becomes that the police must not mean what they say. This is exactly the type of subtle coercive pressure which the *Miranda* opinion condemned.

*United States v. Hernandez,* 574 F.2d 1362, 1368 (5th Cir. 1978). In addition to the minimal time period separating subsequent questioning from defendant's assertion of his desire not to talk, the later interrogation was not about a distinct crime.

The circumstances do not reveal any reprehensible conduct by the FBI agents. They have simply run afoul of the mandates of *Hernandez* and *Mosley.* The statement of Justice Stewart in *Mosley* controls:

> To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned.

423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313.

Accordingly, any and all statements which defendant Morris made to law enforcement officers after invoking his right to remain silent are ORDERED suppressed.

This conclusion renders analysis of defendant's equivocal questions regarding a lawyer unnecessary.